Mr. Keist, appearing for the appellants David and Evelyn Boudette. May it please the court. You know, we talk about freedom of speech and that it's what makes America great. We talk about the need to extol its virtues around the world, and we talk about freedom of religion in this country and that we all should have the right to exercise our religious beliefs  Those issues form the bedrock of our national existence. We know that anyone, whatever their religious belief in the United States, whether it's a Hindu, a Buddhist, a Christian, a Muslim, that they have the right to believe what they believe is correct about God, and they have the right to express those beliefs in a way that's appropriate. These are essential freedoms in our society. It doesn't make any difference whether it's on the street corner or in the workplace. They should be able to state their religious beliefs. And it's the public policy of our nation and of the states, and it demands that every person be allowed to not only believe what they wish about God, but share that belief with others. So in a workplace, you would say that you can march out and say, Women should stay at home, and they're an abomination to God and man if they come into the workplace, and they should be whipped and thrown and beaten and thrown out the front door of the workplace, if your religion makes you believe that. That's okay, right? Is that what you're saying? Well, I think what the court addressed... I'm just asking, is that what you're saying? No, that's not what I'm saying. No, okay. But you should be able to say, Homosexuals are an abomination to God and should not be in the workplace, and God will put upon them, and they're an evil thing to have, and there should be no toleration of homosexuality in the world, much less the workplace. You can say that? No, I'm not saying you can say that either. Okay. Even if your religion says so? Correct. Even if your religion says, and whatever we believe, you should proselytize and you should announce it everywhere and make it part of your life, even so you shouldn't be able to do that. Is that right? Well, I think there are limits. I think the court addressed that in the Peterson case. Just take my example. I'm trying to give you a case pushing the limits. So take that example. Okay, in that example, I think that's the example of the Peterson case of about two months ago decided by this court. Yes. Where the court found that Mr. Peterson, in fact, went out of his way to be hurtful and demeaning to other employees about his views on homosexuality. I.e., to say that homosexuality is an abomination before God and is a great evil. Despite this silly company's attitude to the contrary, that's what I think, and I should be able to say it, right? That's Peterson. That's right. But in Peterson, the court didn't hold. Do you disagree with Peterson, actually? I'm sorry? Does Peterson sort of an outlier on the principle you stated a moment ago when you first started speaking? Yes. Okay. Do you disagree with it? Well, I agree with the Peterson decision. Oh, you do? Okay. And the reason is the court specifically held in Peterson that his problem with Mr. Peterson's actions and his statements was that he testified that he did it out of a sense of demeaning and harassing his co-employees. I mean, the court held specifically that that was the problem with what Mr. Peterson did. It wasn't his sincerely held religious belief. It was how he attempted to voice that belief upon his co-workers and his motivation in doing so. Why does motivation make any difference? If the affected employee perceives it to be discrimination. Well, I think motivation makes it one. It certainly makes it worse. But, I mean, why analytically should there be any difference? I mean, here it looks to me like this is Peterson's absence, the hostility. And I'm not sure that the hostility or the proof of ill will, the intentional mens rea, makes any difference to the analysis. Explain to me why you think it does. Okay. The reason this case is different than Peterson is, in this case, our client, Evelyn Boudette, she did not go out to attempt to reach her co-workers and somehow change their sexual orientation or make them understand that what they were doing was wrong. She answered the request of an employee who came to her asking for her advice. Prior to that time, she had told Carson, hadn't she, that her belief, Boudette's beliefs, taught her that lesbianism was a sin in the eyes of God? Prior to the time that Carson came to her? Yeah. No. I believe that what she. . . I thought they had agreed to disagree on that point. No. I think what she had made known to her was that she was a Christian, and they understood. She understood that Kelly was a lesbian. Kelly understood that she was a Christian. They knew that. I think that was the extent of their real conversations prior to the time that Kelly came to her with all of these problems and asked for her advice. Boudette is Carson's direct supervisor? That's correct. And her response to the counseling is to tell her that it's a sin and invite her to come to church? Well, the response to counseling was to go. . . Or to pray, actually. The first was to pray at the workplace. That's correct. But you have to understand the context, because I think the facts of this case are very important, and that's the reason we believe the court erred below, was that they did not determine the facts in the favor of our client. Carson came to Boudette with this turmoil in her life. She was having all these problems, and she wanted her advice. She asked her for her personal advice. And the record's clear that Boudette told her, look. . . She talked with her about it for a while. And then she said, look, if you want my personal opinion, I mean, I can give that to you, but you know that I'm a Christian, and you know generally what I believe. She said, yes. And she said, well, are you asking that I freely give you my personal opinion? She said, yes, absolutely. That's what the record says. So Boudette shared with her her beliefs about God and about what the Bible says, and that that was a central belief of her faith. But she also shared with her not just that homosexuality was deemed by the Bible to be sin, but that a lot of things were sin, lying, cheating, stealing, and that Boudette herself was a sinner and had had a lot of problems in her own life that way and had kind of turned her life around because of her Christian beliefs. And in fact, Carson asked her, she said, why is it that you seem to be so calm and be so happy and have such calmness in your life? And that was her explanation to her. She didn't go out of her way to say, hey, you know, you, come here. I've heard that you're a lesbian, and I've got a problem with that, and, you know, we need to talk about it. Totally not the facts of this case. And in fact, the facts that the court failed to take into consideration are that after this incident, which did culminate in a prayer at the request of the employee, at the request of Carson, she asked Boudette if she would get up and close the door to her office. She said, would you pray with me? Can we do that? Boudette said, okay. So they prayed, and Carson says she cried. She felt better afterwards. She then comes to Boudette over a period of six months almost daily and talks to her constantly about her personal life, about the changes she's making in her life, about the fact that she's gone to church. She asks Boudette if she'll take her to her church. She goes through this whole series of things and admits that she essentially leads Boudette on in believing that she's accepting her advice and she's welcoming it. She was trying to please her supervisor. Maybe. Yeah, maybe. We don't know what her real motivation was. But certainly she indicates that she is confident that. That explanation is certainly consistent with her explanation at the exit interview as to why she didn't complain about it, isn't it? Well, that explanation would be consistent, but her actions were not consistent. I mean, certainly if she. And Boudette doesn't just pray with her and take her to church. She sort of monitors what's going on, right? Well, only to the extent that Carson comes to her and talks to her. There's no evidence in the record that Boudette ever went and sought Carson out, no evidence that she ever went to her office or otherwise questioned her about her wife. It was always Carson coming to her and talking to her and asking questions and bringing up the discussion. So they were all initiated by the employee. And I think that's the difference in these things. The employer says, listen, we can't have stuff going on in our office where people are telling our employees that you're bad because of your sexual orientation, because you're a lesbian, or you're bad because you're a woman, or anything else. We just can't have that going on, no matter what. We consider that can result in lawsuits against us, for one thing, by the employee who says just what Carson says. Well, I was being put upon by my supervisor, and I was having to do things because my supervisor said so. And I had to listen to what my supervisor said because he's my supervisor. Just like people come in and say things like, well, the reason I accepted his advances is that he's my supervisor. Yeah, I accepted what he did to me, and he put his hands on me a lot, but he's my supervisor, so I accepted it and I wanted to keep my job. So employers say, we can't have that in our workplace. What's wrong with that? I think you're saying, no, you have to accommodate somebody's religion. Who wants to do that? So if my religion is I want to tell people, because you're a lesbian, that's a bad thing. That's an evil to be. It's evil like stealing and all kinds of things to be a lesbian. I want to do that, and you must accommodate my religion because my religion tells me that. I think that's what you're saying, despite the fact the employer on the other side might get sued by the employee who said, yeah, well, you might be accommodating her, but look what it's doing to me. How does the law deal with that? Doesn't it put the employer in a strange position? Well, I think that was Cox's argument, and I would respond to that in a couple of ways. Number one, I think the law is clear, and in this circuit it's clear, that for an employee such as Carson to pursue a claim for harassment, whether it's sexual harassment or just a hostile workplace environment, she would have to show certain things, and they are, one, that she'd suffer some kind of adverse employment action, which never happened. In fact, the evidence is clear that Beaudet gave her the highest possible recommendation as her supervisor and recommended her for a promotion and helped her get a new job, which is the job she was leaving for at the exit interview. But secondly, she has to take advantage of the available remedies with her employer to attempt to reverse the situation. In other words, she has to either go to human resources, if she doesn't want to talk to her supervisor because she thinks it will affect her job, she can go to human resources, she can go above the supervisor's head. They had a process through which she could have complained, a grievance process. Suppose she did that, and they said, whoops, what's this employee Beaudet doing? What is this supervisor doing? She complained, let's say. Let's say she did. Then we'd have a different case. You say we have a different case, but I think you said as soon as the employer says, whoops, what's this Beaudet person doing, now they have to accommodate Beaudet or else they violated her religious rights. Well, they at least have to give Beaudet notice that something she's doing has violated the company policy. Well, I don't know that there's anything like that anywhere in Title VII or anywhere else, that you have to give notice that if you sexually harass somebody that violates the employer's policies or if you otherwise harass them and violate the employer's policies. I didn't know about that. So you're saying that in the religious area you have to tell her, no, I'm sorry, you have to accommodate her somehow? How do you accommodate her, Beaudet? How do you accommodate Beaudet? There are probably several ways. Unfortunately, we never got to that issue in the lower court. I mean, there was no evidence presented as to any attempt to accommodate Ms. Beaudet's beliefs by the employer. Right. In fact, when she became aware that this was an issue was when her direct supervisor and the human resources woman came to her and said, is it true that these things happened several months ago with this employee? And she said yes. That's her first notice that there was a problem. Now, did they offer her the corrective action policy, which is part of the company's employment manual, that they have these coaching steps and they're supposed to verbally counsel her and then do a written plan and all those things? They didn't offer anything. They didn't offer any attempt to work out the problem. In fact, her statement in her deposition was that when she first became aware this was an issue, they asked her, what would you have done? She said, I'd have never said another word to her. If I'd had any idea that any of my comments were unwelcome, I'd have never said another word to her. This is directly opposite of what happened in the Peterson case. In Peterson, they came to him and said, you can't put up these posters. You need to take them down. And he refused. And they had, I believe the evidence was, at least four meetings with Mr. Peterson, with management, trying to get him to work out some kind of a deal that he could be comfortable with, exercising his religious beliefs. And then they finally gave him time off with pay to let him think about it and let him come back to work, and he still put the posters back up. You're close to the end of your time, and you may want to save a little bit for rebuttal. Thank you. I would like to reserve what I have left. Okay. Thank you for your argument, counsel. Mr. Marley. Good morning, Your Honors. Since Judge Hawkins asked us to look at the Balint case before we could start argument, I'll try to address that first, since obviously it was on your mind. That case is an accommodation case. This case, involving Evelyn Beaudet, Kelly Carson, and Coxcom, was never pursued as a failure-to-accommodate case by the plaintiff. It has always been argued and pursued as a disparate impact case under the four-part test of McDonnell-Douglas. We wanted you to read that because, at least from this judge's perspective, it's a different-pronged test from McDonnell that omits one, and because Judge Duncan below said there was no Ninth Circuit authority on this point, it turns out there is. And also some has – I think the Peterson case also addresses how to handle a disparate impact case as well. We just wanted you to be aware of it. That's all. Let's start off the top. This was a 17-year-old, 17-year employee. Yes, Your Honor. Dismissed after a 30 – you know, flat-out fired after a 30-minute meeting with superiors? Yes. Who had decided in advance of the meeting that if she admitted the essence of what Carson had reported, she would be terminated. That's correct. And up until the point of the exit interview, not a single peep or complaint out of Carson? None. That's correct. And also no history, according to Ms. Bodette, that in any way she had been mistreated or treated in an unfair manner because of her religion either. So there was nothing up until that point. And as her supervisor, Bodette had consistently given Carson exemplary ratings. Yes, Your Honor. And when she found out that there was an opening in what was it, Omaha? Omaha. Helped her with the application form, coached her on how to interview, and supported her in getting this job, which was not only a transfer to a place she wanted, but was a promotion in salary. That's correct. And Cox's manual includes what your opponent referred to as a requirement of constructive discipline or whatever label you want to put on it? There's no requirement that all the steps in the constructive discipline or that kind of process actually take place. In fact, it actually says under certain circumstances immediate termination will be considered the appropriate result. And harassment of a coworker is one of those things. So you also have the issue of whether there was any contractual obligations related to Cox's progressive discipline policy or whether that was simply one of its options. And under the Employment Protection Act in Arizona, that would not be contractually binding on either of the parties. So it was simply a process that was there that people could go through under the appropriate circumstances. What about the description of O'Dette's behavior as constituting an exorcism? That may have been an overstatement by Muriel DeGrupper. May have been? Yes. May have been? May have been. You're not prepared to concede that it was? No, Your Honor, I'm not. Okay. You have to look at it from her point of view and what she's hearing Kelly Carson say at the lunch, where she is talking to Ms. Carson about what has happened, what's made you unhappy, what's made you want to leave, and Ms. Carson for the first time goes through this litany of events that has caused her to be uncomfortable and embrace the opportunity. We prayed. We went to church. She made clear to me that my sexual orientation and lifestyle was incompatible with her religious beliefs. Yes. And that's it. And that equals exorcism? Well, perhaps in Ms. DeGrupper's mind it does. But the key here is, Your Honor, and what the attorneys for Ms. O'Dette consistently ignore, is under the Villarimo v. Aloha Airlines case or cases like Elrod v. Sears, when it comes to evaluating whether there's been a nondiscriminatory reason given for an adverse job action, it's what the employer has a reasonable belief about, whether it's objectively false or not. As the Court said in the Elrod case, even if the accusers of Mr. Elrod had been lying through their teeth about his alleged sexual harassment, it's what the employer reasonably believed at the time it made its decision with respect to the job action that's important. So even if we might have differing factual scenarios or differing inferences that might arise with respect to what exactly the relationship between Ms. O'Dette and Ms. Carson may have been, that's not the critical inquiry. Well, you would concede, I expect, that if the description is as given by the plaintiffs, in a sense. Maybe I should put it in a hypothetical. It's purely an invited situation, no harassment, that the discharge would be improper. I would disagree with that. Why? Because that's not what Cox understood at the time it made its decision to terminate Ms. O'Dette. It could have been wrong. It may have been wrong. But it had a belief, based on the reports it got from Ms. Carson and the other investigation it did, as far as interviewing the other employees who had been direct reports to Ms. O'Dette, that she had violated the general harassment policy. Whether Ms. Carson actually would have had a viable claim against Cox isn't the issue. And it's not what this case turns on. What this case turns on is, as in Villarimo, that Cox had a subjective, reasonable, excuse me, an objective, reasonable belief that she had violated the general harassment policy by the things she said. Why shouldn't we look through the prism of this exorcism comment as evidence that there's a question of fact as to whether this was harassment or not? Because it's not an issue of whether, are you assuming, with respect to harassment of Ms. O'Dette? Yeah. Whether what happened between O'Dette and Carson up to the point of the lunch at the Vietnamese restaurant was harassment or not. Because that doesn't make a difference. It makes no difference at all. No. What makes the difference is what Cox understood had been going on, and it's reasonable belief that that activity violated its general harassment policy. Right. That gets you to the legitimate nondiscriminatory reason. I think the question is, does the exorcist comment or something like that, then, is that sufficient evidence of an inference, to create an inference of pretext? In other words, I think that's where we are with it. I understand your point. I just don't think it does, Your Honor. And if the district court didn't, I just don't think that that's enough. I think that's simply reflective of Mariel DeBrucker's legitimate concern, based on what she was hearing from Kelly Carson, that there were problems here. I mean, we can posit this in a lot of different ways. You know, somebody using a very negative racial epitaph in the workplace just once, by itself, may not create a hostile work environment for the employee to whom it is directed, but the company would certainly be entitled to take disciplinary action against that person, because all of the Title VII cases, including cases like Farragher, try to teach us, as employers, that you need to take preemptive action. When you know there's some problem out there, you need to take steps to fix it. You can't let it fester. You have to do something. So whether Kelly Carson was truly working in a hostile work environment is not the key issue. Does it even matter? I mean, your example, would it even matter whether it was a hostile work environment or not, or perceived to be a hostile work environment or not? If the employer just plain says, you know, I've decided to fire you because you made that comment, why isn't that just the end of it? By itself, that is. It's only when the employee who's been fired says you did that for some other reason that's not the reason you just stated to me. So here the employer says, you admit you did X, Y, and Z. We're just not going there. Somebody who does X, Y, and Z is fired, that's all. Now, if I hear the argument from your opponents that said, yes, but if she did X, Y, and Z because of her religion, then you can't fire her. They seem to be suggesting that. That's their argument. So if she said, if she made a racial comment on the basis of her religion, then they would say you can't fire her for making a racial comment. Is that what this case is coming to? I believe so, Your Honor. Under the Villi-Raumo, it is clear that it's what the employer understood was going on. Plus, we also have cases that say it's not this court's job to decide whether Cox acted appropriately under its own policy. You're not a super personnel board. You don't make the final decision. Cox was allowed to make that final decision. And as long as it did not do so in violation of Title VII, it's allowed to make that decision. Now, we've treated religion slightly differently, and that's where Blank goes. They haven't actually alleged or argued accommodation. Correct. But it sounds like accommodation is where they're coming from somehow. Or is the argument here that she was discriminated against because once they heard that there was a religious reason, the religious reason is the reason they fired her, as opposed to what she said was the reason they fired her? Is that what the argument is? I think that's correct, Your Honor. The argument is if they had heard that she made all these statements because she's a good Marxist and Marxists don't like lesbians, as shown by what went on in the Soviet Union, Marxists don't like lesbians, if they had found it was because she was a good Marxist, then they wouldn't have fired her. But when they found out it was because of religion, that's why they fired her. That's what the argument is here? I think that's what they have to argue to make the case that they're trying to make here. Okay. I understand what you think. We're down, in a sense, to the exorcist's comment, because if at the end of the interview they say, well, now you've admitted you hold these religious beliefs, so we're going to fire you, that clearly would be sufficient, at least in my view, that would create an inference of pretext. That might be direct evidence of discrimination. I don't think you'd even have to go through the analysis. But here you have to look at what Cox knew, what Cox had been told, what it understood, what its general harassment policy was, and its attempts to take appropriate steps to prevent any kind of further problems that might come down the road, whether what Ms. Beaudet had done actually would have allowed Kelly Carson to bring some type of claim in state or federal court, based upon what she perceived as the pressure from Evelyn Beaudet that made Kelly Carson uncomfortable. If you have any further questions, I'd be glad to entertain them. I don't see any. Thank you very much for your argument. Rebuttal? Counsel? We'll give you ñ put a minute on the clock. Thank you, Your Honor. Just a second before she does. There you go. Your Honor, Cox argues that they had to terminate Ms. Beaudet because they were addressing a problem in the workplace. They were addressing a problem that they needed to address, that they must address the way they did by terminating her. And yet, what was the problem? I mean, the evidence is clear that she counseled one-on-one, one person, regarding issues that person brought to her. Her testimony is that as soon as she became aware, which is the date they came to her and fired her, that there was a problem, she said, I'll never talk to her about it again. I would never do that. So what problem were they addressing? What were they halting? What issue were they dealing with by firing her? I mean, she wasn't even going to be working for her anymore. Carson had already taken the promotion. They agreed she was going to Omaha. She would not even be working for Beaudet at the time that they fired her. So it sounds like you are talking about accommodation. Well, we are talking about accommodation. And I guess the reason we didn't argue it initially is because this wasn't the normal accommodation case where Beaudet was attempting to exercise some religious belief, like the Balint case where she wanted to take Sundays off and they were not letting her do that. In this case, it all came up at one time, right when she was fired. All right. But the odd thing analytically about this case to me is you would expect to see in this kind of case for you to come forth with evidence saying, well, there are other employees who the same thing happened to who were not treated in the same way, and this person was singled out because of her religion. What you generally see, what your argument seems to be, is either accommodation or sort of a constructive, a wrongful discharge case under state law. But it's tough for me to see a classic discrimination case unless you're resting it on the exorcist comment as a pretext. That comment and the fact that their 30-minute investigation failed to take into consideration all of the other factors, which if they had really looked at it, it's clear that their decision couldn't have been based upon the fact that they believed this employee had been harassed because the evidence of harassment just isn't there. So then the question is, well, then why did they fire her? You've got the exorcism comment and you've got the fact that when pressed, Ms. DeBrucker, who was the person who made the final decision to fire, when pressed in deposition, she said, well, it's because she said to her that the Bible teaches that homosexuality is sin. That's why we fired her, because of that statement. That's what it came down to in the deposition testimony. They fired her because she stated her sincerely held religious belief. That was it. Okay, you're out of time. Thank both counsel for their arguments. It's a very interesting case. We appreciate your help. We're going to stand in recess for five minutes, and then we'll take up the last case, Stonelight Tile, against the Air Quality Management District. Thank you.
judges: Fernandez, Hawkins, Thomas